Barry Levy (BL 2190)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

**SUMMONS ISSUED**

MAUSKOPF J.
J. ORENSTEIN, M.J.

**CV 11 - 5781**

*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co., GEICO General Insurance Co.,*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO.,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

Plaintiffs,

-against-

DMITRIY KHAVKO,
RUSLAN ALYAS,
VLADISLAV ZARETSKIY, and
NATIONAL BILLING & COLLECTIONS CORP.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ NOV 28 2011 ★

BROOKLYN OFFICE
Docket No.:_____ (      )

**Plaintiffs Demand a**
**Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $432,000.00 that the Defendants

wrongfully have obtained from GEICO since 2008 by submitting, and causing to be submitted,

hundreds of fraudulent bills relating to healthcare services (<u>i.e.</u>, initial consultations, follow up

examinations, range-of-motion and muscle testing, electrodiagnostic testing, and physical therapy (collectively the "Fraudulent Services") that allegedly have been provided to persons involved in New York automobile accidents ("Insureds").

2.     The Defendants, Dmitriy Khavko ("Khavko"), Ruslan Alyas ("Alyas"), Vladislav Zaretskiy ("Zaretskiy"), and National Billing & Collections Corp. ("National Billing") have submitted their fraudulent billing, or caused it to be submitted, through SS Medical Care, P.C. ("SS Medical"), a fraudulently incorporated New York professional medical corporation that they secretly and unlawfully have owned and controlled. SS Medical nominally has been owned on paper by Stephen Silverman, M.D. ("Dr. Silverman"), but in actuality has been owned and controlled by the Defendants, none of whom are licensed physicians.

3.     As discussed below, the Defendants at all relevant times have known that: (i) Dr. Silverman has not truly owned or controlled SS Medical, through which all charges for the Fraudulent Services have been submitted; (ii) SS Medical secretly has been owned and controlled by the Defendants – individuals and entities that are not and have never been licensed to practice medicine; (iii) the financial and operational relationships between the Defendants have been created to allow non-physicians to secretly own and control SS Medical and to illegally split fees by funneling the insurance proceeds paid by insurers (including GEICO) to non-physicians; (iv) most of the Fraudulent Services have been provided, to the extent that they have been provided at all, by independent contractors, rather than by SS Medical's employees; and (v) the Fraudulent Services have been provided and billed, to the extent that they have been provided at all, pursuant to pre-determined, fraudulent protocols designed to financially enrich the Defendants rather than to benefit the Insureds who purportedly are subjected to them.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent

2

Services. The chart attached hereto as Exhibit "1" sets forth representative samples of the fraudulent claims that the Defendants have submitted, or caused to be submitted, to GEICO.

4.    As set forth below, the Defendants' fraudulent scheme began in 2008, the Defendants' business is primarily and inherently unlawful, the Defendants' business is racketeering activity, the Defendants' acts of mail fraud are the regular method in which the Defendants conduct their business, and the Defendants' conduct poses a threat of continuing criminal activity. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages exceeding $432,000.00.

## THE PARTIES

### I.    Plaintiffs

5.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the State of New York.

### II.    Defendants

6.    Defendant Khavko resides in and is a citizen of New York. Khavko is not and never has been licensed to practice medicine. Nonetheless, Khavko secretly has owned, controlled, and derived economic benefit from SS Medical in contravention of New York law.

7.    Defendant Alyas resides in and is a citizen of New Jersey. Alyas is not and never has been licensed to practice medicine. Nonetheless, Alyas secretly has owned, controlled, and derived economic benefit from SS Medical in contravention of New York law.

8.    Defendant Zaretskiy resides in and is a citizen of New York. Zaretskiy is not and never has been licensed to practice medicine. Nonetheless, Zaretskiy secretly has owned, controlled, and derived economic benefit from SS Medical in contravention of New York law.

9.    Defendant National Billing is a New York corporation with its principal place of business in New York. National Billing was incorporated on or about September 24, 2008, and is owned and/or controlled by Khavko, Alyas, and Zaretskiy. National Billing has been used by Khavko, Alyas, and Zaretskiy as a tool to illegally own and control SS Medical, and to siphon insurance revenues generated by SS Medical to non-physicians in contravention of New York law.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

11.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District wherein one or more of the Defendants reside and because this is the District wherein a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.   An Overview of the No-Fault Laws and Licensing Statutes

12.   GEICO underwrites automobile insurance in the State of New York.

13.   New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

14.   No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

15.   An Insured can assign his/her right to No-Fault Benefits to health care service providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

16.   Pursuant to the No-Fault Laws, if a professional corporation is unlawfully incorporated, it is ineligible to bill for or collect No-Fault Benefits.  In New York, only a licensed physician may: (i) practice medicine; (ii) own and control a professional corporation authorized to practice medicine; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services. Unlicensed individuals may not: (i) practice medicine; (ii) own or control a professional

corporation authorized to practice medicine; (iii) employ or supervise physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

17.     Pursuant to the No-Fault Laws, health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting, which is prohibited by, inter alia, New York's Education Law.

18.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ... .

19.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

20.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss .... directly to the applicant or, ... upon assignment by the applicant .... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law... .

(emphasis supplied).

21.     For a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons, such as independent contractors, who are not employees of the professional corporation.

22.     Pursuant to New York State Insurance Law § 403, the NF-3s submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Fraudulent Incorporation and Operation of SS Medical

### A.     The Fraudulent Incorporation of SS Medical

23.     Beginning in 2008, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which SS Medical – a medical professional corporation nominally owned on paper by Dr. Silverman but actually illegally owned and controlled by non-physicians – has been used by the Defendants to bill the New York automobile insurance industry millions of dollars for healthcare services that they were not eligible to receive.

24.     To commence their scheme, Khavko, Alyas, and Zaretskiy first had to locate a licensed physician who would be willing to serve as the nominal or "paper" owner of the professional corporation that they planned to fraudulently incorporate. Toward that end, in early

2008 Khavko, Alyas, and Zaretskiy placed an advertisement on the Craigslist website, seeking a physician who would be willing to serve as a front for their unlawful scheme.

25.     Dr. Silverman, who had been experiencing Medicare/Medicaid reimbursement problems with his legitimate medical practice, and who was facing serious financial difficulties, answered the advertisement.

26.     Thereafter, in early 2008, Khavko, Alyas, and Zaretskiy recruited Dr. Silverman, who because of his financial difficulties was willing to sell his medical license to Khavko, Alyas, and Zaretskiy so that they could fraudulently incorporate SS Medical and use it to submit large-scale fraudulent No-Fault billing to GEICO and other insurers.

27.     In order to circumvent New York law and to induce the Department of Education to issue a certificate of authority permitting SS Medical to engage in the practice of medicine, Khavko, Alyas, and Zaretskiy entered into a secret scheme with Dr. Silverman. In exchange for a designated salary or other form of compensation, Dr. Silverman agreed to falsely represent in the certificate of incorporation filed with the Department of Education in 2008, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of SS Medical and that he truly owned and controlled the professional corporation. In reliance on these false representations, the Department of Education issued a certificate of authority permitting SS Medical to engage in the practice of medicine.

28.     Once SS Medical was fraudulently incorporated on about March 31, 2008, Dr. Silverman ceded true beneficial ownership and control over the professional corporation to Khavko, Alyas, and Zaretskiy.

29.     To ensure that they – and not Dr. Silverman – would maintain total control over SS Medical's operations, in SS Medical's initial corporate filings the Defendants listed

Zaretskiy's home address, 209 Stonegate Drive, Staten Island, New York, as the address for service of process upon SS Medical.

30. Khavko, Alyas, and Zaretskiy – rather than Dr. Silverman – provided all start-up costs and investment in SS Medical. Dr. Silverman did not incur any costs to establish SS Medical's practice, nor did he invest any money in the professional corporation he purportedly owns.

31. Dr. Silverman has not been the true shareholder, director, or officer of SS Medical, and has not had any true ownership interest in or control over the professional corporation. True ownership and control over SS Medical instead has rested entirely with the Defendants, who have used the façade of SS Medical to do indirectly what they are forbidden from doing directly; namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

32. Dr. Silverman has exercised absolutely no day-to-day control over or ownership interest in SS Medical. All decision-making authority relating to the operation and management of SS Medical has been vested entirely in the Defendants. In addition, Dr. Silverman neither has controlled nor maintained any of SS Medical's books or records, including its bank accounts; never has selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of SS Medical's financial affairs; never has hired or supervised any of SS Medical's employees or independent contractors, and has been completely unaware of the most fundamental aspects of how SS Medical operates. In reality, Dr. Silverman has been nothing more than a de facto employee of the Defendants.

9

33.     For instance, during a July 28, 2009 meeting with GEICO investigators, Dr. Silverman:

(i)     admitted that he had no control over SS Medical, and that Khavko and Alyas operated the practice;

(ii)    admitted that he did not hire or fire SS Medical employees, admitted that he did not take part in the interview process for new employees, and admitted that Khavko and Alyas were responsible for employment decisions;

(iii)   admitted that he did not have any written agreement with Khavko and Alyas, even though they were operating a medical practice that he supposedly owned; and

(iv)    admitted that Khavko and Alyas handled all financial transactions for SS Medical.

34.     Although SS Medical was fraudulently incorporated in March 2008, it did not immediately commence operations because Khavko, Alyas, and Zaretskiy had not yet found appropriate medical office space, and had not yet incorporated an entity that they could use to siphon away all of SS Medical's profits to themselves.

35.     In about September 2008, Khavko, Alyas, and Zaretskiy caused SS Medical to commence operations from 961 East 174th Street, Bronx, New York – a medical office space they had located and that they controlled.

36.     On September 24, 2008, Khavko, Alyas, and Zaretskiy incorporated National Billing, and caused it to begin operating from the same East 174th Street location at which SS Medical operated.

37.     On September 25, 2008 – one day after incorporating National Billing – the Defendants caused SS Medical to submit its first fraudulent bill to GEICO.

38.     To conceal their true ownership and control of SS Medical while simultaneously effectuating total control over its operation and management, Khavko, Alyas, and Zaretskiy arranged to have Dr. Silverman and SS Medical enter into a series of "management,"

10

"marketing," "lease", "billing", and "collections" agreements with themselves, National Billing, and with other entities that they owned and controlled. These agreements called for exorbitant payments from SS Medical to the Defendants and their entities, in amounts far exceeding SS Medical's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of SS Medical's business; or (ii) the income generated by the professional corporation.

39.     While these agreements ostensibly were created to permit the Defendants to provide leaseholds, "management," "marketing," and "billing" services to SS Medical, they actually have been used solely as a tool to permit the Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own SS Medical; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through SS Medical.

40.     In an attempt to conceal the exorbitant nature of these agreements, the fact that the cost of these agreements to SS Medical have far outweighed the benefit of any services provided to SS Medical pursuant to these agreements, and that the object of these agreements has been to permit unlicensed individuals to secretly and unlawfully own, control and derive economic benefit from SS Medical, Dr. Silverman and the Defendants agreed that none of these agreements would be committed to writing.

41.     The net effect of these agreements between Dr. Silverman, the Defendants, and their entities has been to maintain SS Medical in a constant state of debt to the Defendants, thereby enabling them to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

**B.**     **The Defendants' Fraudulent Treatment and Billing Protocol**

42.     In order to maximize the profits that they could obtain through their fraudulent scheme, the Defendants, Dr. Silverman, and SS Medical routinely purport to subject Insureds to a virtually-identical, medically-unnecessary fraudulent treatment protocol that is designed to maximize the billing that the Defendants can submit, or cause to be submitted, to GEICO, rather than to benefit the Insureds who are subjected to it.

**1.**     **The Fraudulent Initial "Consultations"**

43.     When an Insured arrives at SS Medical, the Defendants – through SS Medical – virtually always purport to provide an initial "consultation", which is billed to GEICO under current procedural terminology ("CPT") code 99244, separate and independent of the other Fraudulent Services that the Defendants purport to provide through SS Medical. For virtually every Insured, this results in a charge of $182.18.

44.     The charges for the initial "consultations" that the Defendants submit through SS Medical are fraudulent in that they misrepresent the nature and extent of the initial consultations.

45.     The Defendants' use of CPT code 99244 is fraudulent inasmuch as it falsely represents the initial patient evaluation services that the Defendants purport to provide through SS Medical to be "consultations". The use of a "consultation" code such as CPT code 99244 represents, among other things, that the Insureds were referred to SS Medical by another healthcare provider for treatment. Furthermore, the use of a consultation code such as CPT code 99244 represents that the consulting physician's findings have been communicated by written report to the physician or other healthcare provider who made the referral.

46.     In virtually every case, no physicians or other healthcare providers referred the Insureds to SS Medical for treatment. Rather, the Insureds presented to SS Medical on their own initiative.

47.     Because, in virtually every case, no physicians or other healthcare providers referred the Insureds to SS Medical for treatment, neither Dr. Silverman nor any other physician associated with SS Medical ever reported the findings of the initial "consultations" to any referring physician or healthcare provider.

48.     The Defendants virtually always falsely represent that SS Medical's initial evaluations of Insureds are "consultations" in order to maximize the billing that they can submit, or cause to be submitted, to GEICO. For instance, during 2008 and 2009, the "consultations" that the Defendants billed under CPT code 99244 were reimburseable at a higher rate (i.e., 182.18) than equivalent, non-consultative new patient office visits, which were billable under CPT code 99204 and would have resulted in charges of $114.33. By falsely representing SS Medical's initial contacts with Insureds to be "consultations" the Defendants therefore increased their billing by more than $67.00 per Insured.

49.     The Defendants' use of CPT code 99244 is fraudulent for other reasons, as well. According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99244 requires the patient to present with problems of moderate severity, and requires that the healthcare provider spend 60 minutes face-to-face with the patient and his/her family during the consultation.

50.     Though the Defendants routinely bill for the initial consultations under CPT code 99244, the Insureds never present with problems of moderate severity. Rather, the Insureds almost never have any significant medical problems as the result of any automobile accident, and

13

– to the limited extent that the Insureds have any medical problems at all as the result of the generally minor automobile accidents they experience – they are problems of low severity.

51.     For instance, virtually every initial consultation provided through SS Medical under the Defendants' control results in a boilerplate diagnosis of "derangement", sprain or strain.

52.     Furthermore, neither Dr. Silverman nor any other physician associated with SS Medical ever spends 60 minutes on the initial consultations. Rather, the initial consultations rarely last more than 15 minutes, to the extent that they are conducted at all.

53.     In addition, according to the Fee Schedule, when the Defendants submit charges for initial consultations under CPT code 99244, they represent that: (i) a physician employed by SS Medical has taken a "comprehensive" patient history; (ii) a physician employed by SS Medical has conducted a "comprehensive" physical examination; and (iii) a physician employed by SS Medical has engaged in medical decision-making of "moderate complexity".

54.     Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of all body systems, not only the body systems that are related to the patient's present complaint.

55.     Pursuant to the Fee Schedule, a "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the patient.

56.     Though the Defendants routinely falsely represent that a physician employed by SS Medical has taken a "comprehensive" patient history from the Insureds SS Medical purports to treat during the initial consultations, no physician employed by SS Medical ever takes a history of all of any Insured's body systems, nor does any physician employed by SS Medical ever take a complete past, family, and social history from any Insured. To the extent that any

14

physician employed by SS Medical takes any patient history at all, it virtually always is limited to a request that the Insured recount the nature of the underlying automobile accident.

57. Pursuant to the Fee Schedule, a "comprehensive" physical examination requires – among other things – that the healthcare provider either: (i) conduct a general examination of multiple patient organ systems; or (ii) conduct a complete examination of a single patient organ system.

58. The Fee Schedule identifies the following organ systems: (i) eyes; (ii) ears, nose, mouth, and throat; (iii) cardiovascular; (iv) respiratory; (v) gastrointestinal; (vi) genitourinary; (vii) musculoskeletal; (viii) skin; (ix) neurologic; (x) psychiatric; and (xi) hematologic/lymphatic/immunologic.

59. Though the Defendants routinely falsely represent that a physician employed by SS Medical has conducted a "comprehensive" physical examination of Insureds during the initial consultations, no physician employed by SS Medical ever conducts a general examination of multiple organ systems, nor do they conduct a complete examination of a single organ system. To the extent that a physician employed by SS Medical conducts any patient examination at all, the examinations virtually always are limited to a perfunctory check of the Insured's vital signs and a series of basic range of motion and muscle tests.

60. Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

61. Though the Defendants routinely falsely represent that the initial consultations performed through SS Medical involve medical decision-making of "moderate complexity", in actuality the initial consultations do not involve any medical decision-making at all.

62. First, in virtually every case, the initial consultations do not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds present at the SS Medical for "treatment" following their generally minor automobile accidents, they do not arrive with any medical records, SS Medical does not request any medical records from any other healthcare providers, SS Medical not conduct any diagnostic tests prior to the initial consultations, and the initial consultations almost always are predicated solely on whatever the Insureds choose to verbally self-report to SS Medical.

63. Second, in virtually every case, there is no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor medical complaints, to the limited extent that they ever have any medical complaints arising from automobile accidents at all. Nor, by extension, is there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants through SS Medical, to the extent that any such diagnostic procedures or treatment options are provided through SS Medical in the first instance. In almost every case, any diagnostic procedures and "treatments" that actually are provided by the Defendants through SS Medical are limited to a series of medically unnecessary diagnostic tests, physical therapy, and pain management modalities, none of which are health- or life-threatening if properly administered.

64. Third, in virtually every case, no physician employed by SS Medical considers any significant number of diagnoses or treatment options for Insureds during the initial consultations. Rather, during almost every initial consultation, Dr. Silverman or another healthcare provider

16

associated with the Defendants asks the Insureds a few boilerplate questions about their automobile accidents and medical history, makes a nearly identical diagnosis for every Insured, and prescribes a virtually identical course of treatment for every Insured, consisting primarily of several months of medically unnecessary physical therapy and biofeedback training.

### 2.    The Fraudulent Follow-Up Examinations

65.    Following the initial "consultations", the Defendants purport to provide at least one, and sometimes as many as eight, follow-up examinations to most Insureds through SS Medical. The Defendants typically bill these follow-up examinations to GEICO using CPT code 99215, resulting in charges of $114.33 per examination.

66.    Like the Defendants' charges for the initial "consultations", their charges for the follow-up examinations are fraudulent in that they misrepresent the nature and extent of the examinations.

67.    According to the Fee Schedule, the use of CPT code 99215 requires the patient present with problems of moderate-to-high severity, and that the healthcare provider spend 40 minutes face-to-face with the patient and his/her family during the examination.

68.    The Defendants routinely bill for the follow-up examinations under CPT code 99215 even though, as set forth above, the Insureds never present with problems of moderate severity, much less moderate-to-high severity. Rather, to the limited extent that the Insureds have any medical problems at all as the result of the generally minor automobile accidents they experience – they are problems of low severity.

69.    Furthermore, no physician employed by SS Medical ever spends 40 minutes on the follow-up examinations. Rather, the follow-up examinations rarely last more than 10 minutes, to the extent that they are conducted at all.

17

70.    In addition, according to the Fee Schedule, when the Defendants submit charges for follow-up examinations under CPT code 99215, they represent that: (i) a physician employed by SS Medical has taken a "comprehensive" patient history; (ii) a physician employed by SS Medical has conducted a "comprehensive" physical examination; and (iii) a physician employed by SS Medical has engaged in medical decision-making of "high complexity".

71.    As set forth above, and pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of all body systems, not only the body systems that are related to the patient's present complaint.

72.    Furthermore, as set forth above, and pursuant to the Fee Schedule, a "comprehensive" patient history requires that the healthcare provider take a complete past, family, and social history from the patient.

73.    Though the Defendants routinely falsely represent that a physician employed by SS Medical has taken a "comprehensive" patient history from the Insureds during the follow-up examinations, no physician employed by SS Medical ever takes a history of all of any Insured's body systems, nor does any physician employed by SS Medical ever take a complete past, family, and social history from any Insured. To the extent that anyone at SS Medical takes any patient history at all, it virtually always is limited to a request that the Insured recount the nature of the underlying automobile accident, and set forth any issues that have developed in the days or weeks since their previous examination.

74.    As set forth above, and pursuant to the Fee Schedule, a "comprehensive" physical examination requires – among other things – that the healthcare provider either: (i) conduct a general examination of multiple patient organ systems; or (ii) conduct a complete examination of a single patient organ system.

18

75.     Though the Defendants routinely falsely represent that a physician employed by SS Medical has conducted a "comprehensive" physical examination of Insureds during the follow-up examinations, no physician employed by SS Medical ever conducts a general examination of multiple organ systems, nor do they conduct a complete examination of a single organ system. To the extent that the anyone at SS Medical conducts any patient examination at all, the examinations virtually always are limited to a perfunctory check of the Insured's vital signs and a series of basic range of motion and muscle tests.

76.     As set forth above, and pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

77.     Though the Defendants routinely falsely represent that the follow-up examinations at SS Medical involve medical decision-making of "high complexity", in actuality the follow-up examinations do not involve any medical decision-making at all.

78.     First, as with the initial "consultations", in virtually every case the follow-up examinations at SS Medical do not involve the retrieval, review, or analysis of any significant number of medical records, diagnostic tests, or other information. Rather, to the extent that the follow-up examinations entail the review of any medical records at all, the review is limited to the basic initial "consultation" reports and physical therapy treatment notes generated by the Defendants, which amount to a handful of boilerplate pages.

19

79.     Second, in virtually every case, there is no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor medical complaints, to the limited extent that they ever have any medical complaints arising from automobile accidents at all. Nor, by extension, is there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants through SS Medical. In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provide through SS Medical are limited to a series of medically unnecessary diagnostic testing, physical therapy and pain management modalities, none of which are health- or life-threatening if properly administered.

80.     Third, in virtually every case, no physician employed by SS Medical considers any significant number of diagnoses or treatment options for Insureds during the initial consultations. Rather, during almost every follow-up examination, Dr. Silverman or another healthcare provider associated with the Defendants asks the Insureds a few boilerplate questions about their automobile accidents and medical history, makes a nearly identical diagnosis for every Insured, and prescribes a virtually identical course of treatment for every Insured, consisting primarily of a continuation of the medically unnecessary physical therapy and biofeedback training that initially is prescribed during each Insured's initial "consultation".

### 3.    The Fraudulent Biofeedback Training

81.     Following the initial "consultations", the Defendants purport to provide multiple rounds of purported biofeedback training through SS Medical to virtually every Insured.

82.     Pursuant to the Fee Schedule, administration of biofeedback training is limited to qualified physicians.

20

83.     The Defendants bill for this putative biofeedback training under CPT code 90901, resulting in charges of $82.89 per training session. The Defendants typically purport to provide between seven and 12 biofeedback training sessions through SS Medical to each Insured, resulting in charges of between $580.00 and $994.00 per Insured.

84.     Biofeedback training is a process that enables an individual to learn how to change physiological activity in order to improve health and performance.

85.     In a legitimate biofeedback training session, patients are connected to precise instruments such as electromyographs, thermometers, electrodermographs, electroencephalographs, electrocardiographs, and the like, which are used measure physiological activity such as brainwaves, heart function, breathing, muscle activity, and skin temperature. These instruments rapidly and accurately "feed back" information to the patient, who uses the information, and the physician's interpretation of the information, to learn how to control his or her own bodily functions – for instance, to relax a certain muscle group. Over time, patients learn how to control these functions without the assistance of any equipment or healthcare provider.

86.     The goal of any legitimate biofeedback training course is to teach patients how to control their own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

87.     Therefore, any legitimate biofeedback training course must include meaningful documentation of, among other things:

(i)     the indication for biofeedback training within the overall treatment plan – in other words, the specific symptom or problem that the biofeedback training is intended to address;

21

(ii)    the type of biofeedback training that is being provided – for instance, the specific bodily functions that the patient is being trained to control;

(iii)    the readings, or feedback, provided by the instruments during each training session, and the extent to which the readings or feedback vary from session-to-session; and

(iv)    the progress of the patient, or lack thereof, through the course of training.

88.    Though the Defendants submit a large number of biofeedback training charges through SS Medical for virtually every Insured, SS Medical does not actually conduct any biofeedback training. For instance, during the biofeedback training sessions that the Defendants purport to provide through SS Medical:

(i)    no one at SS Medical advises the Insureds that they are undergoing biofeedback training, nor does anyone at SS Medical ever explain the purpose of the biofeedback training that they purport to provide;

(ii)    no one at SS Medical provides the Insureds with any interpretation of any data regarding their bodily functions; and

(iii)    no one at SS Medical trains the Insureds, in any way, to control their bodily function without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments;

89.    Nor, by extension, does anyone at SS Medical maintain any meaningful documentation as to the indication for biofeedback training within the overall treatment plan, the type of biofeedback training that is being provided, or the progress of the Insureds – or lack thereof – through the course of training.

90.    Nor does anyone at SS Medical maintain any meaningful documentation of any actual coaching or assistance that they provide to the Insureds with respect to controlling their bodily functions.

Case 1:11-cv-05781-RRM-JO Document 1 Filed 11/28/11 Page 23 of 45 PageID #: 23

91.    Nor does anyone at SS Medical maintain any meaningful records that would permit Dr. Silverman, or any other healthcare provider employed by SS Medical, to monitor the Insureds' progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching the Insureds how to control their own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

92.    When the Defendants submit their billing for the biofeedback training sessions, they not only conceal the fact that the sessions never are conducted in the first instance, but they also conceal the fact that the sessions are not conducted by a qualified physician.

93.    Specifically, in every bill for biofeedback training that the Defendants submit or cause to be submitted, the Defendants list Dr. Silverman as the treating provider. However, during a July 28, 2009 meeting with GEICO investigators, Dr. Silverman admitted that he does not perform biofeedback training – or any other service other than patient examinations – at SS Medical.

94.    The Defendants falsely list Dr. Silverman as the biofeedback training provider in the billing that they submit, or cause to be submitted, to GEICO in order to conceal the fact that the biofeedback training that they purport to provide to Insureds through SS Medical is not performed by a qualified physician – to the extent that it is provided at all.

**4.    The Fraudulent Neurological Consultations and Electrodiagnostic Testing**

95.    The Defendants also purport to provide neurological consultations and electrodiagnostic testing to most Insureds through SS Medical.

96.    Like the initial consultations, the neurological consultations are fraudulent inasmuch as the Defendants bill for them using CPT code 99244, yet:

23

(i)     the Insureds present with problems of low severity, to the extent that they present with any problems at all as the result of the generally minor automobile accidents they experience;

(ii)    the neurological consultations take less than 15 minutes to perform, to the extent that they are performed in the first instance;

(iii)   the physicians who purport to perform the neurological consultations never take a history of all of any Insured's body systems, nor do they ever take a complete past, family, and social history from any Insured; and

(iv)    the neurological consultations involve no medical decision-making at all, and virtually every Insured subjected to them receives the same boilerplate diagnoses of "derangement" and sprain/strain.

97.     Based upon these bogus diagnoses, the physicians who purport to conduct the neurological consultations for the Defendants then make the pre-determined "conclusion" that the Insureds require electrodiagnostic testing to rule out cervical radiculopathy, lumbar radiculopathy, and/or peripheral neuropathy. The physicians who purport to conduct the neurological consultations arrive at these pre-determined "conclusions" because of the financial remuneration provided by the Defendants.

98.     The Defendants then purport to provide electrodiagnostic testing to most Insureds through SS Medical, namely electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs").

99.     The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

24

100.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

101.    EMGs and NCVs both are forms of electrodiagnostic tests, and purportedly are performed and interpreted by physicians associated with the Defendants because they allegedly are medically necessary to determine whether the Insureds have radiculopathies and other forms of neuropathies.

102.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. A copy of the Recommended Policy is annexed hereto as Exhibit "2". The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

25

103.     The Defendants' pre-determined, uniform package of EMGs and NCVs stands in marked contrast to the Recommended Policy in several major respects. For instance, the Recommended Policy states that the maximum number of NCVs and EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; (iii) two H-reflex studies; and (iv) EMGs of two limbs. See Exhibit "2".

104.     In an attempt to extract the maximum amount of billing out of each Insured, however, the Defendants routinely purport to provide through SS Medical: (i) NCVs of at least four, and often as many as eight, motor nerves; (ii) NCVs of at least six, and often as many as 10, sensory nerves; and (iii) EMGs of four limbs.

105.     The Defendants' pre-determined package of neurological consultations and electrodiagnostic tests is conducted solely for the purpose of enabling the Defendants to submit large-scale, fraudulent charges to GEICO and other insurers through SS Medical. For example, for most Insureds that are "treated" through SS Medical, these charges include:

| CPT Code | Service | Charge |
|---|---|---|
| 99244 | 60 minute office consultation for new or established patient. | $182.18 |
| 95864/95861 | Four extremity EMG with paraspinal areas/ two separate two extremity EMGs with paraspinal areas | $408.64/$483.00 |
| 95903 | Four/eight motor nerve NCV study – with F wave study | $665.88/$1,331.76 |
| 95904 | Six/10 sensory nerve NCV study | $638.82/$1,064.70 |
| 95934 | Two H-reflex study | $239.98 |
| | | |
| | **TOTAL:** | $2,135.50 - $3,301.62 |

106. Not only do the Defendants routinely subject Insureds to medically-unnecessary neurological consultations and electrodiagnostic tests, they frequently unbundle the tests to maximize the fraudulent charges that they can submit, or cause to be submitted, to GEICO.

107. Specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals to submit maximum EMG charges of: (i) $185.73 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 if an EMG is performed on at least five muscles in each of four limbs.

108. The Defendants, however, routinely submit two separate charges of $241.50 for the EMGs performed on the muscles in both arms and $241.50 for the EMGs performed on the muscles in both legs. These two separate charges total $483.00. Separate charges are submitted because, as described above, under the Fee Schedule, the maximum charge for EMGs performed on the muscles in all four limbs is $408.64. This is the maximum charge to which the Defendants would be entitled if the EMGs were medically necessary, which they are not, and all other conditions of coverage are satisfied. Thus, the "unbundling" of the EMG charges in every instance results in an overcharge of approximately $75.00.

### 5. The Fraudulent Range of Motion and Muscle Testing

109. In most cases, the Defendants cause SS Medical to instruct each Insured to return for multiple rounds of medically useless range of motion ("ROM") and muscle testing.

(i)     **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

110.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

111.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion." Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

112.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

113.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

114.    Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treats at SS Medical – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength are an essential component of the "hands-on" examination of a trauma patient. Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial consultation, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations. In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided ROM/muscle Tests.

**(ii)    The Defendants' Duplicate Billing for ROM/Muscle Tests**

115.    The Defendants cause SS Medical to conduct manual range of motion and muscle testing on each Insured during every initial consultation and follow-up examination. The charges for these tests are part and parcel of the charges that the Defendants submit for the initial consultations under billing codes 99244, and for follow-up examinations under billing code 99215.

116.    Despite the fact that every Insured already has undergone manual range of motion and muscle strength testing during their initial consultation and follow-up examinations, and despite the fact that reimbursement already has been paid by GEICO as a component of the initial

consultation and/or follow-up examinations, the Defendants systemically bill for, and cause SS Medical to purport to perform, a series of additional ROM and muscle tests on most Insureds.

117. Though the Insureds routinely visit SS Medical for follow-up examinations during the course of treatment that the Defendants purport to provide, and though the Insureds already receive routine ROM and muscle strength testing during their initial consultation and these follow-up examinations, the Defendants often deliberately schedule separate appointments for ROM/muscle Tests so that they can bill for those procedures separately, without having to include them in the billing for the initial consultation and follow-up examinations, as required by the Fee Schedule.

118. The ROM and muscle testing that the Defendants purport to provide through SS Medical represents a purposeful and unnecessary duplication of the manual ROM and muscle strength testing conducted during the initial consultations and follow-up examinations. The ROM and muscle testing is part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" is rendered pursuant to a pre-established protocol that: (i) in no way aids in the assessment and treatment of the Insureds; and (ii) is designed solely to financially enrich the Defendants.

**(iii)    The Defendants' Unbundling of ROM and Muscle Tests**

119. In addition, the Defendants routinely fraudulently unbundle their charges for ROM and muscle tests– i.e., submit them as multiple charges despite the existence of a single, appropriate charge – in order to maximize the fraudulent billing that they can submit, or cause to be submitted, to GEICO.

120. Pursuant to the Fee Schedule, where ROM and muscle strength testing is provided to a single Insured on a single date, the testing must be billed using CPT code 97750.

30

121. CPT code 97750 does not permit multiple, independent charges for ROM and muscle strength testing on various extremities or body parts on a single date. Rather, CPT code 97750 is time-based, with one charge of $45.71 permitted for every 15 minutes of testing that is provided. Therefore, if ROM and muscle testing was conducted on 25 body parts during a single, 15-minute period, only one charge of $45.71 under CPT code 97750 would be permitted.

122. If ROM and muscle strength testing is provided to an Insured separately, on different dates, then a healthcare provider may bill for the ROM testing under CPT code 95851, and may bill for the muscle strength testing under CPT code 95831. These codes are not time-based – instead, they are based on the number of extremities or body parts that are tested.

123. For instance, assuming that ROM testing is conducted on a separate day from muscle testing, a healthcare provider seeking reimbursement for ROM testing in New York may bill $45.71 under CPT code 95851 once – per patient, per day – for each "extremity" (i.e., arms and legs) or "trunk section" measured (i.e., cervical, thoracic, or lumbar) on which the measurements are taken. Thus, a healthcare provider potentially could submit several charges of $45.71 for ROM testing on a single patient on a single day, provided that the healthcare provider tested more than one patient extremity or trunk section and did not simultaneously conduct muscle strength testing.

124. Similarly, assuming that muscle strength testing is conducted on a separate day from ROM testing, a healthcare provider seeking reimbursement for muscle strength testing in New York may bill $43.60 under CPT code 95831 once – per patient, per day – for each "extremity" or "trunk section" measured on which the measurements are taken. Thus, a healthcare provider potentially could submit several charges of $43.60 for muscle testing on a

31

single patient on a single day, provided that the healthcare provider tested more than one patient extremity or trunk section and did not simultaneously conduct ROM testing.

125.   In virtually every instance, the Defendants have purported to provide ROM testing through SS Medical to Insureds on the same days when they purported to provide muscle strength testing to Insureds. Therefore, they are required to submit their billing for the ROM and muscle strength testing using CPT code 97750, and – assuming all other conditions of coverage are satisfied – their charges for the ROM and muscle strength testing are limited to $45.71 for every 15 minutes of testing that is performed.

126.   The ROM and muscle strength testing that the Defendants purport to provide through SS Medical never takes longer than 15 minutes for any given Insured on any given day – to the extent that it is provided in the first instance.

127.   Even assuming that the ROM and muscle strength testing that the Defendants purport to provide is reimburseable, non-duplicative and medically-useful, the maximum amount that the Defendants could charge for the ROM and muscle strength testing that they purport to provide through SS Medical therefore would be $45.71 per Insured, per day.

128.   In order to maximize the fraudulent charges that they can submit, or cause to be submitted, for ROM testing on each Insured, the Defendants routinely submit multiple charges of $45.71 for a single Insured on a single day, using CPT code 95851.

129.   In order to maximize the fraudulent charges that they can submit, or cause to be submitted, for muscle strength testing on each Insured, the Defendants routinely submit multiple charges of $43.60 for a single Insured on a single day, using CPT code 95831.

130.    By unbundling their charges for ROM and muscle testing, the Defendants typically quadruple the fraudulent ROM and muscle strength testing charges that they submit, or cause to be submitted, to GEICO.

### 6.    The Fraudulent Billing for Services Provided by Independent Contractors

131.    The Defendants' fraudulent scheme also includes submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors; the healthcare services must be provided by the professional corporations themselves, or by their employees.

132.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act..."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions

33

based upon interpretations of the Medicare statute issued by the CMS). Copies of these DOI opinion letters collectively are annexed hereto as Exhibit "3".

133.    Dr. Silverman has been the only physician actually employed by SS Medical from its incorporation on March 31, 2008 through the present. All of the other physicians who have purported to perform services through SS Medical have been independent contractors, rather than employees of the professional corporation.

134.    Furthermore, the physical therapists who purport to perform physical therapy services on behalf of SS Medical are independent contractors, not employees of SS Medical.

135.    Other than initial consultations and follow-up examinations performed by Dr. Silverman, all of the Fraudulent Services billed to GEICO through SS Medical – including all of the physical therapy, biofeedback training, neurological consultations, and electrodiagnostic testing – have been performed, to the extent that they have been performed at all, by physicians, technicians, and physical therapists whom the Defendants treated as independent contractors.

136.    For instance, the Defendants:

(i)     paid the physicians, technicians, and physical therapists, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the physicians, technicians, and physical therapists that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the physicians, technicians, and physical therapists;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians, technicians, and physical therapists;

(v)     failed to withhold federal, state or city taxes on behalf of the physicians, technicians, and physical therapists;

(vi)    compelled the physicians, technicians, and physical therapists to pay for their own malpractice insurance at their own expense;

34

(vii)   permitted the physicians, technicians, and physical therapists to set their own schedules and days on which they desired to perform services;

(viii)  permitted the physicians, technicians, and physical therapists to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the physicians, technicians, and physical therapists for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, technicians, and physical therapists were independent contractors.

137.   By electing to treat the physicians, technicians, and physical therapists as independent contractors, the Defendants realize significant economic benefits. For instance, in so doing, the Defendants have benefitted by:

(i)     avoiding the obligation to collect and remit the income tax owed by the physicians, technicians, and physical therapists as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance to cover the physicians, technicians, and physical therapists as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance to cover the physicians, technicians, and physical therapists; and

(vi)    avoiding claims of agency-based liability arising from the physicians', technicians', and physical therapists' work.

138.   Because the physicians, technicians, and physical therapists are independent contractors and perform the medical services, SS Medical never had any right to bill for or collect No-Fault Benefits in connection with those services.

35

139.    The Defendants billed for the services as if they were provided by actual employees of SS Medical to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations consciously were designed to mislead GEICO into believing that it was obligated to pay SS Medical, when in fact GEICO was not.

**III.    The Fraudulent NF-3 Forms Submitted to GEICO**

140.    To support charges for the Fraudulent Services, statutorily prescribed claim forms for No-Fault Benefits (i.e. the NF-3 forms) consistently have been submitted through SS Medical to GEICO by and on behalf of the Defendants since September 2008, seeking payment for services for which the Defendants are ineligible to receive payment.

141.    The NF-3 forms submitted to GEICO by and on behalf of the Defendants are false and misleading in the following material respects:

(i)     The NF-3 forms uniformly misrepresent to GEICO that SS Medical is lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, SS Medical is not properly licensed in that it is a medical professional corporation that was unlawfully incorporated and which, in reality, has been owned and controlled by non-physicians and who owned and controlled SS Medical for their economic benefit, while designating Dr. Silverman as the "nominal" or "paper" owner.

(ii)    The NF-3 forms uniformly misrepresent to GEICO that SS Medical is lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, SS Medical is not properly licensed in that it is a medical professional corporation that engaged in unlawful fee splitting with non-physicians.

(iii)   With the exception of NF-3 forms covering services allegedly provided by Dr. Silverman, the NF-3 forms uniformly misrepresent to GEICO that SS Medical is eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that allegedly have been performed. In fact, SS Medical is not eligible to seek or pursue collection of No-Fault Benefits associated with services not alleged to have been provided by Dr. Silverman because the services were not provided by the SS Medical's employees.

36

(iv)   The NF-3 forms uniformly misrepresent to GEICO that the Fraudulent Services are medically necessary and are performed in accordance with the requirements of the Fee Schedule and, therefore, that SS Medical is eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Services are not medically necessary or are not performed in accordance with the requirements of the fee schedule, rendering SS Medical ineligible to receive reimbursement for those services under the No-Fault Laws.

(v)    The NF-3 forms uniformly misrepresent to GEICO the level and nature of services in order to mislead GEICO into paying for such services.   In fact, the bills submitted by or on behalf of the Defendants misrepresent and exaggerate the level of services provided, to the extent that any services are in fact provided, and unbundle the services in order to inflate the charges.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

142.   The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the performance of the Fraudulent Services and the submission of charges to GEICO.

143.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

144.   Specifically, they knowingly misrepresented and concealed facts related to SS Medical in an effort to prevent discovery that the professional service corporation is unlawfully incorporated, owned and controlled by non-medical professionals and engaged in fee splitting, and therefore ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented Dr. Silverman's ownership of and control over SS Medical in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit medicine to be practiced through SS Medical. In reliance on the Defendants' material misrepresentations and omissions, the New York State

37

Department of Education did, in fact, issue the licenses required to permit medicine to be practiced through SS Medical.

145.    Likewise, in every NF-3 form that the Defendants have submitted or caused to be submitted, the Defendants uniformly misrepresent that SS Medical properly is incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact it is not.

146.    In addition, the Defendants entered into complex financial arrangements with SS Medical that were designed to, and did, conceal their true ownership of and control over SS Medical.

147.    Moreover, the Defendants have arranged for some of the independent contractors who perform the Fraudulent Services to be paid on a split 1099-W-2 basis, in order to conceal the fact that they are independent contractors and to create the illusion that they are employees of SS Medical.

148.    Furthermore, the Defendants knowingly have misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services are medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that can be submitted.

149.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

150.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above,

38

were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages exceeded $432,000.00 based upon the fraudulent charges representing payments made by GEICO since September 2008.

151.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to the fraudulent schemes described herein until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### AGAINST KHAVKO, ALYAS, ZARETSKIY, AND NATIONAL BILLING
(Violation of RICO, 18 U.S.C. § 1962(c))

152.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 151, above.

153.    SS Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), which engages in activities affecting interstate commerce.

154.    Khavko, Alyas, Zaretskiy, and National Billing knowingly have conducted and/or participated, directly or indirectly, in the conduct of SS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon their use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that SS Medical was not eligible to receive under the No-Fault Laws because: (i) it is unlawfully incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting with non-physicians; (iii) it bills for services performed by independent contractors; and iv) the Fraudulent Services are not medically necessary, and are performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control SS Medical

in contravention of New York law, and in many cases are not performed at all.. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprises, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

155.    The Defendants' pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Defendants are attempting collection on the fraudulent billing to the present day. Moreover, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

156.    SS Medical's business is racketeering activity, inasmuch as the enterprise was created and exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Khavko, Alyas, Zaretskiy, and National Billing operate SS Medical, insofar as SS Medical never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for SS Medical to function.

157.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $432,000.00 pursuant to the fraudulent bills submitted by the Defendants through SS Medical since September 2008.

158.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION AGAINST
## KHAVKO, ALYAS, ZARETSKIY, AND NATIONAL BILLING
(Violation of RICO, 18 U.S.C. § 1962(d))

159.　GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 158, above.

160.　SS Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

161.　Khavko, Alyas, Zaretskiy, and National Billing are associated with SS Medical.

162.　Khavko, Alyas, Zaretskiy, and National Billing knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of SS Medical's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon their use of the United States mails to submit hundreds of fraudulent bills to GEICO and other insurers. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

163.　Khavko, Alyas, Zaretskiy, and National Billing knew of, agreed to, and acted in furtherance of, the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

164.　GEICO has been injured in its business and property by reason of the above conduct in that it has paid more than $432,000.00 pursuant to the fraudulent bills submitted through SS Medical since September 29, 2008.

165.　By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST
## KHAVKO, ALYAS, ZARETSKIY, AND NATIONAL BILLING
(Common Law Fraud)

166. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 165 above.

167. Khavko, Alyas, Zaretskiy, and National Billing intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

168. The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i) In every claim, the representation that SS Medical is lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, SS Medical is not properly licensed in that it is a medical professional corporation that was unlawfully incorporated and which, in reality, has been owned and controlled by non-physicians and who owned and controlled SS Medical for their economic benefit, while designating Dr. Silverman as the "nominal" or "paper" owner.

(ii) In every claim, the representation that SS Medical is lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, SS Medical is not properly licensed in that it is a medical professional corporation that engaged in unlawful fee splitting with non-physicians.

(iii) In every claim other than claims covering services allegedly provided by Dr. Silverman, the representation that SS Medical is eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that allegedly have been performed. In fact, SS Medical is not eligible to seek or pursue collection of No-Fault Benefits associated with services not alleged to have been provided by Dr. Silverman because the services were not provided by the SS Medical's employees.

(iv) In every claim, the representation that the Fraudulent Services are medically necessary and are performed in accordance with the requirements of the Fee Schedule and, therefore, that SS Medical is eligible to receive No-Fault Benefits

42

pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Services are not medically necessary or are not performed in accordance with the requirements of the Fee Schedule, rendering SS Medical ineligible to receive reimbursement for those services under the No-Fault Laws.

(v)     In every claim, misrepresentation and exaggeration and unbundling of the services provided, to the extent that any services are in fact provided.

169.     Khavko, Alyas, Zaretskiy, and National Billing intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SS Medical that were not compensable under the No-Fault Laws.

170.     GEICO justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $432,000.00 based upon the fraudulent charges.

171.     The extensive fraudulent conduct of Khavko, Alyas, Zaretskiy, and National Billing demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

172.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION AGAINST
### KHAVKO, ALYAS, ZARETSKIY, AND NATIONAL BILLING
(Unjust Enrichment)

173.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 172 above.

174.     As set forth above, Khavko, Alyas, Zaretskiy, and National Billing have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

175.    When GEICO paid the bills and charges submitted by or on behalf of SS Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Khavko, Alyas, Zaretskiy, and National Billing.

176.    Khavko, Alyas, Zaretskiy, and National Billing have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

177.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

178.    By reason of the above, Khavko, Alyas, Zaretskiy, and National Billing have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $432,000.00.

## JURY DEMAND

179.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff GEICO Insurance Company demands that a Judgment be entered in its favor:

A.      on its First Cause of Action against Khavko, Alyas, Zaretskiy, and National Billing, for more than $432,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest;

B.      on its Second Cause of Action against Khavko, Alyas, Zaretskiy, and National Billing, for more than $432,000.00 in compensatory damages, together with treble

damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    on its Third Cause of Action against Khavko, Alyas, Zaretskiy, and National Billing, for more than $432,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.    on its Fourth Cause of Action against Khavko, Alyas, Zaretskiy, and National Billing, for more than $432,000.00 in compensatory damages, plus costs and interest; and

E.    awarding Plaintiff its costs including reasonable attorneys' fees, and any other relief the Court deems just and proper.

Dated:    November 28, 2011

RIVKIN RADLER LLP

By: _____

Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

45